Thank you. May it please the Court, Jeremy Brown appearing for the bill, and I would like to reserve two minutes of my time for rebuttal. All right. If you watch the clock, I'll try to help you as well. Thank you. Defendant challenges in this case the denial of his motion for a new trial. That motion was brought after the discovery of serious misconduct within the lab that was not only holding but processing and transforming, and eventually testing the physical evidence in this case. And the actions of that lab were primarily carried about by one chemist, Rockland McDowell. And what Rockland McDowell did is very early on in this case, he took a substance that was provided by the confidential informant in a crystalline form and transformed it into a white powder that's essentially indistinguishable from other white powders. And when he did that, he did so at a time that he had unfettered access to at least three boxes of undocumented drugs. And within at least one of those boxes were multiple vials of methamphetamine. Is there any suggestion in any of the reports that were the State conducted of this box that any of the technicians sort of took methamphetamine or took drugs from the box to analyze and then attribute it to the drugs that they seized from the any particular investigation? The investigation didn't even attempt to address that, I don't think. Sotomayor, is there any hint of that? I mean, it seems like the box was used to contain a variety of drugs that they used for, as they put it, as meet-and-greet. I thought it was kind of interesting. And you have a good point there, because if they were truly maintaining drugs for meet-and-greet or for training purposes, they had a legitimate way to do that. They could have simply documented where the drugs came from and kept accurate records regarding its weight and its usage. The very act of choosing not to do that, of continuing to add more drugs to this box, when they had a valid way to do it, is an act that cannot be done for any legitimate purpose. So to begin with, that is evidence there. There's also evidence of actual tampering with evidence samples that are in our possession. They say that McDowell says in the report he's removing the drugs from quantitative analysis samples. That's an active case. That's a case where evidence is moving on to be processed or being returned. And so he is withdrawing drugs. He's changing that evidence as he does that. But there's no hint that McDowell sort of was using drugs from the box or other drugs to wrongfully attribute a known quantity to, you know, secure a conviction. There's nothing like that here, is there? Well, the opportunity to investigate that comes by the defendant, by being able to effectively cross-examine him. And so that's why the disclosure of this information at a time period where the defense could have made use of it, so they could ask him these important questions. That's what we're contesting here, is that the opportunity only comes, the only time these chemists are going to be questioned regarding how these were used, is by defense counsel at trial. Sotomayor, go ahead. No, go ahead. Let's assume there was a NAPU violation and that the testimony about always having everything in the vault is considered to be false. You still have to get over the, albeit lessened, prejudice prong of NAPU. And the question, and this does relate to what Judge Paez is asking, how do you meet that prong? How do you meet the NAPU requirement of this having an effect on the outcome of the trial? Well, it's the government's burden to prove two things with evidence, that the evidence that was tested was the same evidence that was delivered to them, and also that this evidence is methamphetamine. And to meet that burden falls squarely on the lab's actual policies and procedures and how they handled the evidence. And when the jury receives, or if the jury would have known of this evidence, then they would have called them up. Known about the box. Known about changing samples in the evidence cases. And known about there's other evidence that was disclosed that McDowell was not following through with his test protocols, that where the protocols called for doing two tests, he only did one and waited for the results and didn't follow through by testing two samples. So had they known of all the problems within the lab, they would have had serious questions about the handling, could there have been cross-contamination, could there have been adulteration, and then just the ability to follow through with procedures for accurate results. And what about the other testimony, though, balanced off that, the confidential informant, the references to meth, you know, that that's what they were going there to sell, that the other officer that received it, in his experience, it was meth, et cetera. So it's not a conviction that rests solely on the laboratory evidence in terms of linking it to meth, is it? To some extent, I think it is. Because remember that confidential informant. She is going through the recorded conversations at the same time she's testifying. On the recorded conversations, there's no talk about an exchange of methamphetamine or another drug. She says that this happened at another time, that this happened during a telephone conversation she didn't record. And that, in fact, she says, you know, you had to take my word for it that that telephone conversation happened. So I think that's something that's presented in the government's brief as if that was out there in the recorded conversation, and it simply wasn't. That relies on her credibility. There's also no talk about the exchange of money. She says that a mention of five during the transcript means I was exchanging something for $500. But all of those issues come down directly to her credibility. And at the original trial, her credibility was bolstered by the lab's actions. The prosecution could say, don't worry about the issues we have with our confidential informant, because we have these very responsible people that are following procedures in the lab to double-check that what she's given us is actual meth. Well, now they can no longer do that. And so it really focuses the defense and focuses the jury to question her reliability, and because that's what the government's case would have to depend on once this information is or after this information is disclosed. Scalia. Counsel, the trial attorney in this case, after receiving notice that there was this problem with the handling of the exhibits that were sent to the lab, he filed a motion for a new trial based on newly discovered evidence and cited the Krasny case as the case that the trial court should consider. The trial court considered that and ruled against the appellant. In your brief before us, you're not talking really about Krasny. In fact, you're saying the court was wrong in applying Krasny, and it should have applied Brady and its progeny. That was not presented to the trial judge, was it? The rule in Brady was not presented to the trial judge. The rule to apply the evidence was not presented. The court's correct on that. But what was presented were the elements of a Brady claim. Now, the ---- Brady wasn't mentioned at all in the reading of the motion.  And that's why I said the elements of the claim. The trial counsel did not use the terminology, but you don't have a right to the term Brady. You have the right to the fundamental issues that Brady has come to define. And those fundamental issues were raised, that this was evidence held by the government, that it was withheld, exculpatory impeachment. It's troubling to me that that an appellant can tell a trial court, here is the case that controls this case, but on appeal, he's arguing there are other cases that control. And the court was wrong in following the case that the appellant told the court to follow. And it's not an ideal situation. But to some extent, that is the function that all of us have, including the court, to recognize, to apply the right rule to the evidence. And I believe that the burden here really on the appellant, on the defendant, was to raise the elements of the claim, not even if they don't match that to the proper rule, but elements were raised. And so they will have to present the controlling theory or cases to the court so the court can rule properly? Well, I do think they have to present the controlling theory, and that that was part of their case, that this was newly discovered evidence. Newly discovered evidence that was in the government's possession, that was withheld, that if it had been provided by the government, it could have been used to impeach their witnesses. That's a Brady claim, whether you label it that or not. You want to save the remaining time? I do. Thank you. Good morning, members of the court. May it please the court, I'm Jack Haycock, and I'm the prosecutor in this case. It's my job to know everything that's going on in my case. It's my job to know problems in advance. And we had a very unfortunate disclosure in this case after the trial was over. I believe I did my due diligence in preparing for trial. I spoke with the lab people. I asked them about the handling of the evidence in this case. I have to confess, I did not ask about this particular issue. I did not know it existed. You mean you didn't ask them if they by chance kept a stash of drugs in the ceiling tiles? That's correct. Understandably. I could not conceive of such a thing. But I am responsible for it, and I wish that I had learned of it before trial. And it makes me angry that I did not. It makes me angry that this was going on at the lab, and I did not know of it. And it's exactly the type of evidence that we would have disclosed to the defense, of course, had we known, and it would have been dealt with before trial. But having said all that, this court does not have to reverse this conviction because of this issue. A thorough investigation was conducted by the Idaho State Police. And as the court has alluded in its questions, there was no indication of any evidence in any case, no indication that there was a problem with any of the analysis in any case whatsoever in the lab. The people in the lab made a mistake, but it was not related to any actual case or to this case. There was no evidence that any case was contaminated by the drugs in the sample box, and there's no reason to doubt the lab tests in this case. The district court, who heard the entire trial, agreed that the box was not material. And as the court has also alluded to in its questions, there was other evidence that the drugs in this case actually were methamphetamine. There were the recordings. Meth was not specifically mentioned, but I've learned over the years that people that are buying and selling drugs don't talk in those terms. They kind of talk in velve terms. But the defendant did make a statement on the recording that if he got caught doing what they were doing, that he would go back to prison for a very long time and would never get out. The appearance of the substance in the baggie was similar to meth, the detective testified. And the price and the quantity was consistent with meth. So there was other evidence that it was meth besides just the analyst's testimony. There were no issues with testing or tampering. And the district court expressed confidence in the test, expressed confidence in the case, despite the problem with the drug box in the ceiling. Do you think it makes any difference whether we view the Brady claim, so we'll just call it Brady claim, either waived or forfeited for our purposes of review? Well, I guess I would argue, as I have, that it was not specifically raised in the district court. The district court didn't have an opportunity to address that issue, but- But it's forfeited review for plain air, right? Correct, Your Honor. Yes, Your Honor. I guess the evidence is that certainly the US Attorney's Office didn't know about this. Right. The people at the lab did, and it wasn't disclosed until afterwards. But we didn't have a chance to address it with the district court. The district court didn't have a chance to review it. The Brady issue. The Brady issue, yes, Your Honor. Right. And- Well, it looks like a, it kind of looks like elements of a Brady claim right there. It does. It kind of looks like it. Although, in terms of prejudice, it's one of those cases where the court could have confidence that even if there was a Brady claim, that there's no prejudice. Because the investigation was thorough, it did not show any problem with the actual analysis of any of the drugs, and thus there is no harm. Well, you'd have to look at all the other evidence that was presented at the time of trial. That's correct, Your Honor. When a Brady claim is properly asserted, though, and the court concludes that Brady was violated, does the opponent have to show prejudice? Well, no, and I didn't mean to say that. I guess what I'm saying is that in this case, the prosecutor's office did not know of this. If we had, of course, we would have disclosed it. We didn't find out until the defense found out. Well, here the appellant's lawyer, trial lawyer, knew that there was a possible Brady problem and didn't raise it in the trial court. That's correct, Your Honor. Under those circumstances, must the appellant show prejudice if he forfeits the issue? Well, I believe under that circumstance he does, Your Honor. Well, in any Brady claim, you have to show that it's material, which, if I'm not mistaken, it has to be showing that the result, if you include the Brady material, that it's likely or reasonably probable that the result would be different. Yes, Your Honor. Call that prejudice or call it materiality. There has to be an assessment. I'd agree with that. And if it's viewed that the testimony was actually false about either I had it in the vault or I had it right here, then he would have a NAPU claim, and would you agree that the prejudice consequence there is slightly less than on the Brady claim? I would, Your Honor. It seems to me that's where we ought to focus. I mean, that plus potentially plain error, because it might not have really been raised, in which case we would look at it under plain error, but then we'd have to add plain error superimposed on the NAPU standard. And would you address how you think that would work? Well, I my view, Your Honor, is that there was no false testimony. He wasn't asked about this exact thing or about such an out-of-the-way thing as drugs. A stash of drugs up in the ceiling. He was asked about how the evidence in this case was handled, and that's what he addressed. Right. That's kind of what the – there's no evidence that he used any of the methamphetamine from the box. None, Your Honor. None whatsoever. The investigation was very thorough. They talked to everybody that worked in the lab. There was no hint of any problem with the testing or any contamination whatsoever. Right. But his description of what he did in general wasn't completely true, right? When he says he's telling about the policies and what he does in every case, in effect. And he's saying when I receive evidence, not this evidence, when I receive evidence, this vault, that's my vault, nobody else had access. Either the evidence would be in that vault or it would be physically in my possession. Well, he was talking there, Your Honor, about the evidence in this specific case or whatever specific case he's testing, and he explained that he had his vault in his work area, and he keeps it there until he's completely done with it, and then he would return it to the main vault. And so in terms of the evidence in this case or the evidence in any specific case, that's what he does. That's what he does, except for the part that he takes out and puts in the ceiling. So that's why that's false. I understand. I understand. I understand you could read that into it. However, in terms of this specific case, he said that he handled it appropriately and very carefully.  I see my time is very limited, so I'll ask. Well, we'll give you a minute for rebuttal, so you'll have some time. Thank you. I was going to ask if there were any questions, but let me just say that I disagree that he was testifying about the specifics of this case. He was asked about general lab policies so that those policies could be used to create the impression that procedures were in place generally that would present exactly this type of activity. And he talked about not only how he follows those procedures, but how other chemists within the lab follow the same procedures. And he knew that he didn't follow the procedures, and he knew that other chemists in the lab were not following those procedures. In fact, he went to them and asked them to hide the box of drugs in the ceiling, and he went and they knew that they were donating parts of their sample to the box. So in both instances, he knows that that testimony is not accurate. As far as whether or not there was any test results that would have shown whether there was actual tampering. Remember, at the point where even the defense counsel becomes involved in this case, this evidence has already been transposed into the white powder. You can tell what the white powder is now and what the consistency of it is now, but you can't tell what it was like before McDowell got his hands on it. There's no test you can run to compare the two because all of it is used up in making the subsample. Thank you, Your Honors. Thank you. The case just argued, United States v. Ellingford, is submitted. Thank both of you for your arguments. Interesting case.
judges: Alarcon, McKeown, Paez